# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| BRIAN H. OAK,<br><br>      Plaintiff,<br><br>  v.<br><br>KRISTEN MATTHEWS OAK, CLIFF KELLEY, TERRY FELSMAN, JAMES "J.R." MILLER, and CITY OF POCATELLO, an Idaho political subdivision,<br><br>      Defendants. | Case No. 4:12-cv-00040-REB<br><br>**MEMORANDUM DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

   Currently pending before the Court is the Motion for Summary Judgment filed by

Defendants City of Pocatello, Terry Felsman, Cliff Kelley, James "J.R." Miller, and Kristen

Matthews Oak (Dkt. 25) and Plaintiff Brian H. Oak's Motion for Partial Summary Judgment

(Dkt. 26).

## BACKGROUND

   Contemporaneous to the events that led to this lawsuit, Plaintiff Brian Oak ("Oak") and

Defendant Kristen Matthews Oak ("Matthews")[1] were in the midst of marital difficulties that

ultimately led to Matthews filing for divorce from Oak on December 30, 2009.  Blake Hall Aff.,

---

   [1]  The Complaint identifies this defendant as Kristen Matthews Oak; however, her
affidavit does not use the surname Oak.  To distinguish them more easily, the Court will refer to
Defendant Kristen Matthews Oak as "Matthews" and Plaintiff Brian Oak as "Oak."

**MEMORANDUM DECISION AND ORDER - 1**

Ex. 2 (Dkt. 25-7), Brian Oak Dep., 10:23-25. Matthews is an officer employed by the City of

Pocatello Police Department. Oak brings claims of constitutional violations against all

Defendants, and a claim for violation of the Fair Credit Reporting Act ("FCRA") against his ex-

wife, Matthews. The Court will first address the constitutional claims and then address the

FCRA claim.

## FACTUAL BACKGROUND

On August 24, 2009, an altercation occurred between Oak and Matthews at their family

home. Oak Dep. at 117-120. During this incident, Matthews had placed herself in front of the

closed door on the inside of the couple's bedroom. Oak attempted to physically remove her from

that position, first by picking her up underneath her armpits and then later by applying a

technique he learned as a reserve deputy in which he applied force underneath her jaw in order to

get her to move. Oak Dep. at 117:1-118:24. During the altercation, Matthews screamed and

yelled at Oak not to touch her and fought back at him, which turned into a "wrestling match."

Oak Dep. at 117:17-119:19. Following the altercation, Matthews' neck was red and scratched.

She had their daughter, Amanda, take pictures of her neck. Oak Dep. at 120:23-25. At the time

of the altercation, none of the couple's children were in the bedroom. Affidavit of Brian Oak I

(Dkt. 31), ¶ 10.

Months later, on December 30, 2009, Matthews filed for divorce from Oak.[2] Matthews

says that in January 2010 she became fearful because Oak was acting erratically, she thought he

might have placed surveillance items on her car and computer, and he was always carrying a

---

[2] As part of the divorce proceeding in civil court, Matthews had sought to have Oak
removed from their home. Affidavit of Peter Wells, Ex. E (Dkt. 33-10), Motion to Quash NCO
Hearing ("NCO Hearing"), 14:5-11.

**MEMORANDUM DECISION AND ORDER - 2**

gun.  Affidavit of Kristen Matthews (Dkt. 25-6), ¶ 10.  She feared he might harm her.  *Id*.

Later in January 2010, Matthews decided to report the August 2009 incident to the Pocatello Police Department, where she was employed as an officer.  Matthews Aff., ¶ 10.  She first had a conversation with Captain Terry Felsman, telling him that she had been a victim of domestic violence and that she feared something might happen again.  *Id*.  Captain Felsman then spoke to Chief James "J.R" Miller, who told Felsman to assign the case to a detective to investigate.  Wells Aff., Ex. D (Dkt. 33-9), Felsman Dep., 58:7-18; Wells Aff., Ex. C (Dkt. 33-8), Miller Dep., 24:10-17, 51:19-24.  On January 28, 2010, Captain Felsman assigned Lieutenant Cliff Kelley to investigate the allegations.[3]  Matthews Aff. ¶ 11.

According to Chief Miller, when a complaining witness was a City of Pocatello police officer, as the chief of police he had discretion to determine whether or not his office would investigate the allegations.  There was no policy that such an investigation had to be assigned to an outside agency.  Miller Dep. at 42:9-15, 57:15-24.  In addition, according to Chief Miller, Idaho law required that his officers investigate allegations of domestic violence regardless of when it occurred or who the complaining witness is.  *Id*. at 72:22-73:3.

Lt. Kelley interviewed Matthews about the incident on January 28, 2010.  The conversation was recorded.  Wells Aff., Ex.B (Dkt. 33-2--7) Kelley Dep., 31:1-6.  In the audio recording, Matthews described the August 2009 altercation.  She said that Oak moved her by her jaw and put his knee against her ear, resulting in pain that lasted for nearly six weeks and left red

---

[3]  There is some discrepancy as to who was involved in the initial discussions and reporting of Matthews' allegations.  Chief Miller testified that he was contacted by both Captain Felsman and Lt. Kelley.  Miller Dep. at 24:12-17.  Matthews testified that she first reported her allegations to Lt. Kelley, Sgt. Nelson and Captain Felsman.  NCO Hearing at 23:4-5.  However, these factual discrepancies are not material for the purpose of deciding the pending motions.

marks and scratches on her face. She said she fought back and tried to kick him. Matthews told Lt. Kelley that all the children were home when this occurred, although they likely did not hear anything. After the altercation, she had her daughter, Amanda, take photos of her neck and face but did not tell her what happened. Matthews said that she and Oak did not typically have a physically violent relationship. She said that she was scared and frightened; that she "can't live like this" and needs "peace." Matthews said that she had recently found a gun in Oak's nightstand, and that she believed he had installed spyware on her computer and a GPS tracker on her vehicle. Matthews also said that she thought Oak was trying to make her look bad in the divorce proceedings, and that because of judges disqualifying themselves in the divorce proceedings, a hearing on her request in the divorce case to have Oak removed from the family home was being delayed.

During the interview, after Matthews has explained to Lt. Kelley that she is having trouble getting a hearing to have her husband removed from the home in the divorce proceeding and Lt. Kelley is discussing options, she whispers "get a no contact order" and then follows up with it "has to be in conjunction with a criminal charge." At the end of the interview, Lt. Kelley informed Matthews that he also would interview her daughter and Oak. Audio Recording of Kristen Oak and Lt. Kelley at approx. 2:30, 2:50, 3:23, 4:50, 8:17, 10:13, 10:40-11:00, 11:30, 14:25, 16:00, 18:10, 18:50, 19:43-55, 25:36. *See* Wells Aff, ¶ 18; Dkt. 34.

On January 29, 2010, Lt. Kelley interviewed the couple's daughter, Amanda Oak, whose interview was recorded. He also attempted to interview Oak, who declined to speak with Lt. Kelley without an attorney present. Kelley Dep., Ex. 1 (Dkt. 33-5) (Police report). On these last two occasions, Lt. Kelley was accompanied by Sgt. Nelson. Kelley Dep. at 32:13-33:3.

**MEMORANDUM DECISION AND ORDER - 4**

Amanda told Lt. Kelley and Sgt. Nelson that she remembered taking pictures of her mother's face and neck after the altercation in question but that she did not know what happened, nor did she hear or see anything. She assumed her parents got into a fight. Audio Recording of Amanda Oak at approx. 3:10, 3:28. *See* Wells Aff., ¶ 19; Dkt. 34.

Lt. Kelley prepared an incident report around 1 p.m. on January 29, 2010. Kelley Dep., Ex. 1. Lt. Kelley later met with the prosecutor, Steven Herzog. Kelley Dep. at 34:3-8. Lt. Kelley testified that after he interviewed Matthews and Amanda Oak and had gathered all the information, he went to Mr. Herzog's office and "presented the facts . . . and deferred to him for charges." *Id*. at 31:1-9, Ex. 2 (Uniform Citation). Lt. Kelley and Mr. Herzog then sought a no contact order from Sixth District Magistrate Judge Carnaroli.[4] *Id*. at 79:23-83:22, Ex. 6 (No Contact Order). Herzog testified that when he and Lt. Kelley went to Judge Carnaroli's chambers, the uniform citation form had been filled out by Lt. Kelley.[5] Wells Aff., Ex. A (Dkt. 33-1), Herzog Dep. at 19:4-24. *See also* NCO Hearing at 22:13-16. (Herzog: "The defendant [Brian Oak] has been charged with domestic battery based upon what the witness told Sgt. Kelley. He [Kelley] believed there was probable cause and a charge was filed.")

Lt. Kelley served the uniform citation and no contact order on Oak at the family home at 5:35 p.m. on January 29, 2010. Kelley Dep. at 78:18-79:15. After being served with the citation and no contact order, Oak left the house. Oak Aff. II at ¶¶ 14- 15.

---

[4] At the NCO Hearing, Lt. Kelley testified that Mr. Herzog said Judge Clark could not sign the no contact order because he had disqualified himself in the divorce case and previously represented Matthews in his private law practice. NCO Hearing at 109:3-19; 23:9-13.

[5] The citation on its face appears to have been filled out by Lt. Kelley. Mr. Herzog's name does not appear on it. Kelley Dep., Ex. 2.

**MEMORANDUM DECISION AND ORDER - 5**

Subsequently, Oak filed a motion to quash the no contact order. At the hearing on the motion on February 16, 2010, Matthews testified that Oak never threatened her with violence or a gun. NCO Hearing at 28:18-29:15. Sixth District Magistrate Judge Evans presided over the hearing and quashed the no contact order, finding it had been improperly issued, noting that the incident had occurred over six months earlier, the parties had been living together during the months that followed, and there had not been any further disputes or threats. *Id*. at 127-31.

An independent prosecutor, Randall Kline, was then assigned to the criminal case against Oak. On June 8, 2010, he moved to dismiss the domestic battery charge. Oak Aff. II at ¶¶ 30-31.

## SUMMARY JUDGMENT STANDARD

One principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool [ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The evidence, including all reasonable inferences which may be drawn therefrom, must be viewed in a light most favorable to the non-moving party and the Court must not make credibility findings. *See id*. at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other

hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in his favor. *See id.* at 256-57. The non-moving party must go beyond the pleadings and show "by [his] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003). Statements in a brief, unsupported by the record, cannot create an issue of fact. *Barnes v. Independent Auto. Dealers*, 64 F.3d 1389, 1396 n. 3 (9th Cir. 1995).

**CONSTITUTIONAL CLAIMS**

**A.  Defendants City of Pocatello, Chief Miller and Captain Felsman Cannot be Liable on These Facts.[6]**

Under *Monell v. Dep't. of Soc. Serv. of City of New York*, 436 U.S. 658 (1978), "local governing bodies [. . .] can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where [. . .] the action that is alleged to be unconstitutional implements or executes a policy, statement, ordinance, regulation, or decisions officially adopted and promulgated by that body's officers." *Id.* at 690.  Significantly, "a municipality cannot be held liable *solely* because it employs a tortfeasor." *Id.* at 691 (emphasis in original).

**1.  There is No Causation Evidence Pointing to a Municipal Policy**

In order to press his claim against the these Defendants, Oak must show evidence "that a constitutional deprivation was directly caused by a municipal policy." *Oviatt By and Through Waugh v. Pearce*, 954 F.2d 1470, 1477 (9th Cir 1992).  The burden is on Oak to show a relevant policy or custom on the part of the Pocatello Defendants.  *Gilette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir. 1992).  The policy must be the "moving force" behind plaintiff's alleged constitutional violation.  *See Mabe v. San Bernandino County Dep't of Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).

Oak offers only conclusory statements.  There are no documents, statements, records or other evidence tied to the City of Pocatello or its police department identifying an alleged official policy that deprived him of a constitutional right.  Oak attempts to rely upon deposition testimony of Chief Miller, in which Chief Miller said that the department's policies were being

---

[6] A suit against individual defendants in their official capacity is essentially the same as a suit against the municipality.  *See Monell*, 436 U.S. at 690, n. 55.

**MEMORANDUM DECISION AND ORDER - 8**

revised at the time of the events at issue.  *See* Oak's Opposition (Dkt. 30) pp. 10-11 (*citing* Miller Dep. at 96-97).  Oak also points to Chief Miller's testimony that the City of Pocatello had a low compliance rate with its policies.  *Id.*

However, also of significance on these issues is Chief Miller's testimony that the Police Department had an informal policy that when the alleged victim of a crime was a police officer employed by the City of Pocatello, then the Chief would be informed of the circumstances and the City would handle the investigation unless he decided otherwise.[7]  *See* Miller Dep. at 42, 57. In this instance, Chief Miller decided that his department would investigate Matthews' allegations, just as it ordinarily would do in any other similar case.  *Id.* at 70.

Even if this policy allowed for discretion on the part of the police chief as to how the investigation would be conducted, and even if the policy could be characterized as having an ad hoc nature, those characteristics do not, together or separately, constitute evidence sufficient to support Oak's claims in this case.  Oak must do more than merely make conclusory allegations that this policy violated his constitutional rights.  Oak must demonstrate how the policy amounted to deliberate indifference, *i.e.*, how the deficiency involved was obvious and the constitutional injury was likely to occur.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001).  Even a policy of "inaction" may lead to liability if such inaction "amounts to a failure to protect constitutional rights."  *Id.* (internal citations and quotations omitted).  On this possible avenue of his necessary proof, however, Oak has not sufficiently demonstrated that any municipal policy, even a policy of "inaction," undergirds his claims against these particular defendants.

---

[7] This is in contrast to a situation in which a complaint is made *against* an officer.

## 2. There is No Evidence of Municipal Indifference

When, as here, there is no evidence of a direct policy or a widespread custom, a plaintiff "may attempt to prove the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded." *Gilette*, 979 F.2d at 1349 (citing *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986)). In other words, a municipality's failure to train or supervise its employees can be an unconstitutional policy for purposes of § 1983 liability. *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). However, to be actionable, the failure to train or supervise must amount to "'deliberate indifference to the rights of persons' with whom those employees are likely to come into contact." *Lee*, 250 F.3d at 681 (quoting *City of Canton*, 489 U.S. at 388-39).

Additionally, "[d]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). For these consequences to be known or obvious, it is "'ordinarily necessary'" that there be a pattern of similar constitutional violations by untrained employees. *Connick v. Thompson*, – U.S. –, 131 S. Ct. 1350, 1360 (2011) (quoting *Brown*, 520 U.S. at 410). The rationale for requiring such a pattern is obvious, *i.e.* that "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

Oak argues that the City, Chief Miller, and Captain Felsman deliberately ignored a "clear conflict of interest" when it came to investigating the domestic violence allegations of a fellow police officer which resulted in a constitutional injury. But even if the Court were to accept

such a generalized proposition (and again, remembering that the internal policy in this regard pertained to allegations raised by an officer against someone outside the police department, not allegations raised against a member of the police department), the particular allegation of a conflict of interest on these facts is not evidence of a pattern of disregard of a known or obvious consequence of constitutional injury to persons with whom the officers come into contact.  *Lee*, 250 F.3d at 681 (quoting *City of Canton*, 489 U.S. at 388-39) Oak points to no other evidence that indicates a *pattern* showing a violation of constitutional rights in similar circumstances.

While there are certain circumstances when a pattern of similar violations may not be necessary and local governments may be liable for a single incident, this only occurs if "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," that a municipality and its policymakers can be said to have been deliberately indifferent.  *Canton*, 489 U.S. at 390, n. 10.[8]  Even viewing the evidence most favorably for Oak, he has failed to raise a genuine issue of material fact as to whether the City of Pocatello, Chief Miller, and Captain Felsman were deliberately indifferent. But as with the lack of any evidence of a pattern of constitutional violations, there is also no persuasive evidence that the need for more or different training is so obvious, or even the fact of any glaring inadequacy in the same that it is "obvious," that a violation of constitutional rights will follow.[9]

---

[8]  The oft-repeated example of this – hypothesized by the Supreme Court in *Canton* – is a city that arms its police officers but fails to train them on the proper use of deadly force despite knowing "to a moral certainty" that officers will be required to capture fleeing felons.  489 U.S. at 390, n. 10.  The circumstances in this case most assuredly do not rise to that level of certainty.

[9]  Because the Court finds that these Defendants are not liable on these claims, it is not necessary to address their argument of qualified immunity.

**MEMORANDUM DECISION AND ORDER - 11**

**B.** **Chief Miller and Captain Felsman are not Liable in their Individual Capacities**

Pleading in the alternative, Oak also sues Chief Miller and Captain Felsman in their individual capacities. Such claims require that Oak demonstrate "culpable action, or inaction, directly attributed" to them. *Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011). To be sure, Chief Miller and Captain Felsman do not have to be "'directly and personally involved in the same way as are the individual officers who are on the scene,'" inflicting the alleged injury. *Id.* (citation omitted). Rather, their "participation" could include their own culpable action or inaction in, among other things, the training, supervision, or control of their subordinates. *See id.* (citing *Larez v. City of Los Angeles*, 946 F.2d 630, 645-46 (9th Cir. 1991). The charged official must, however, have a "sufficiently culpable state of mind," meaning that the official must exhibit "deliberate indifference" to a substantial risk of serious harm. *Blankenhorn v. City of Orange*, 485 F.3d 463, 485 (9th Cir. 2007). Oak must show a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989). Moreover, the standard for imposing individual liability requires something greater than mere negligence, even if a prima facie case for negligence could be shown. *Blankenhorn*, 485 F.3d at484-85.

Oak's allegations against Chief Miller and Captain Felsman are premised upon the policies in place at the time of the incident in question. He argues, in essence, that there was a lack of a policy, and that the alleged fact of a lack of policy amounted to deliberate indifference. *See* Oak's Opp'n, pp. 10-12. Further, he alleges that by deciding not to have an independent agency investigate Matthews's claims, Chief Miller and Captain Felsman ignored a clear conflict

of interest which resulted in a constitutional injury.[10]

There is no question but that Oak believes the police department's policy on this particular issue is a flawed and mistaken policy. But he offers no evidence to support his argument that there is something so fundamentally flawed about the policy as to suggest that the very existence of the policy creates a culpability tantamount to deliberate indifference on the part of Chief Miller or Captain Felsman. Perhaps, if there were proof that discussion of the policy had identified that the policy existed for the purpose (or even the possibility) of providing opportunity to act in a manner intended to favor a fellow officer by trampling upon the constitutional protections of that officer's spouse, the necessary connection could be penciled into this record. But there is no such proof. There are no allegations, let alone facts, that satisfy the elements that Oak must prove here. There is no indication that either of these Defendants have the requisite culpable state of action, or inaction, necessary to impose individual liability. Captain Felsman reported Matthews' allegations to Chief Miller who told him to assign a detective to investigate. Captain Felsman did so. These acts do not demonstrate a "deliberate indifference" to a substantial risk of harm. Furthermore, there is no evidence of a pattern of constitutional violations stemming from the policy, or lack of policy, complained of by Oak. There is no evidence that Chief Miller or Captain Felsman were on notice that their policies regarding a potential conflict of interest situation were inadequate and likely to result in a constitutional violation. Chief Miller and Captain Felsman are entitled to summary judgment on

---

[10]  There is no evidence in the record that Captain Felsman was involved in the decision to have the investigation of Matthews' allegations against Oak be done by the Department. Chief Miller testified that was his decision.  *See* Miller Dep., pp. 24, 51-52; Felsman Dep., p. 58.

the constitutional claims against them in their individual capacities.[11]

**C.      Claims Against Matthews and Lt. Kelley**

> **1.      Oak Has Not Established a Fourteenth Amendment Claim for a Violation of a Liberty Interest in his Family Relationships**

There is no question that a parent has a Fourteenth Amendment liberty interest in the companionship and society of his or her child. *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). A deprivation of that interest may rise to a violation of the substantive component of the Due Process Clause. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir. 1998). However, such claims require significant proof. To prevail on such a claim here, Oak must show that the defendant's conduct in causing the deprivation is so arbitrary and unreasonable that it "shocks the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). The determination of "[w]hat state of mind shocks the conscience depends on the circumstances of a particular case." *Provencio v. Vasquez*, 258 F.R.D. 626, 640 (E.D. Cal. 2009) (citation omitted). Mere negligence, however, is never enough. *Woodrum v. Woodward County*, 866 F.2d 1121, 1126 (9th Cir. 1989) (citing *Daniels v. Williams*, 474 U.S. 327, 330-32 (1986)).

In reviewing this claim, the Court begins with the no contact order, the legal instrument concerning which Oak complains most vociferously. The no contact order did not prohibit Oak

---

[11]  To the extent that Oak attempts to argue that Chief Miller and Captain Felsman were in an agreement to pursue false or malicious claims against him, the facts do not support such an inference. His argument is premised solely on speculation, even if he believes it is justified speculation based upon a belief that the department acted in collective lock-step to protect its own. In contrast, however, the record otherwise indicates that Chief Miller and Captain Felsman's involvement in the criminal investigation of Oak was limited to their roles as supervisors, with the ultimate assignment of Lt. Kelley to investigate the claim.

from having contact with his children.[12]  There is no allegation contained in the complaint, nor

any evidence in the record, of how long and under what circumstances Oak did not have contact

with his children.  While the no contact order was in place for 18 days, it did not prevent Oak

from seeing his children.  It prohibited contact with Matthews, and ordered him to stay away

from the family residence, where Matthews was continuing to live.  The Court is mindful that

there is a practical impediment at play, when someone is ordered to stay away from the family

residence, in having regular contact with his or her children, but the record contains no specific

evidence that Oak was prevented from seeing, or was ordered not to see or otherwise contact, his

children even though he was not allowed to be at the family home.

There may well have been other factors at play in regard to whether, and how often and

for how long, Oak spent time with his children.  Matthews may have made it difficult for him to

see them.  The children may not have wanted to see him.  But those roadblocks are not

sufficiently the product of the no contact order, and similarly cannot be the product of alleged

misconduct in the obtaining of the no contact order, to support his claim.  Accordingly, there is

no basis for Oak to argue that any of the Defendants have violated a Fourteenth Amendment

liberty interest in the right to the companionship and society of his children.

### 2.     Oak Has Not Established a Fourteenth Amendment Due Process/Taking of Property Claim

Oak alleges in his complaint that the Defendants' wrongful actions include the "[t]aking

of Plaintiff's property without due process of law, secured by the Fourteenth Amendment of the

United States Constitution."  Compl., Dkt. 1, ¶ 39.  Oak argues that there is "no justification,

---

[12]  The no contact order was issued on January 29, 2010 and quashed on February 16, 2010.

**MEMORANDUM DECISION AND ORDER - 15**

compensation or otherwise, for the government to take one's property and give it to another."
Pl.'s Response Memorandum (Dkt. 30), p. 17.[13]   As best the Court can discern, Oak appears to
be making a substantive due process[14] claim by claiming his property was improperly taken
when the no contact order was issued and kept in place for 18 days.[15]

A substantive due process violation is one which "shocks the conscience."  It occurs in a
situation in which the government's action is clearly arbitrary and unreasonable, having no
substantial relation to the public health, safety, morals or general welfare.  *Sinaloa Lake Owners
Assoc. v. City of Simi Valley*, 864 F.2d 1475, 1484 (9th Cir. 1989).

The no contact order was in place for 18 days.  During that time, Oak had to stay away
from the family home, where the alleged victim, Matthews, continued to live.  While there was a
temporary loss of the use of his home, he was not permanently deprived of his home, nor does

_____

[13]  Oak cites one case in support of this argument in his brief, *Kelo v. City of New
London, Conn.*: "It has long been accepted that the sovereign may not take the property of A for
the sole purpose of transferring it to another party B, even though A is paid just compensation."
545 U.S. 469, 477 (2005).  However, the court in *Kelo* states this proposition while discussing
the concept of eminent domain.

[14]  Oak does not make any allegations in his complaint, nor in his opposition to
Defendants' motion for summary judgment, that there were inadequate procedures in place with
regard to an opportunity to be heard at a meaningful time and in a meaningful manner.
Accordingly, the Court has interpreted his claim to be that of a substantive due process violation,
rather than a procedural due process violation.

[15]  There is no sensible scenario that the Court can envision by which Oak can assert a
Fifth Amendment takings claim.  The Fifth Amendment provides, "nor shall private property be
taken for public use, without just compensation."  There are two types of "per se" takings: (1)
permanent physical invasion of the property; and (2) a deprivation of all economically beneficial
use of the property.  *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426
(1982); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015-16 (1992).  A regulatory "taking"
occurs when "regulatory actions [occur] that are functionally equivalent to the classic taking in
which government directly appropriates private property or ousts the owner."  *See Penn. Central
Trans. Co. v. City of New York*, 438 U.S. 104 (1978).

his temporary removal due to the no contact order rise of the level of "arbitrary and unreasonable" action that constitutes a constitutional violation.[16]  No contact orders, such as the one in place during this 18 day time period, serve a legitimate purpose of protecting an alleged victim's safety and welfare.  Following the issuance of the no contact order, there was a hearing in which a judge found the no contact order was improperly issued and it was quashed.  Taken in an objective perspective, rather than Oak's subjective view (and to do the same is not a qualitative criticism of Oak's viewpoint), the issuance of a no contact order in the context of a domestic violence complaint does not "shock the conscience."  The Court acknowledges that the no contact order was later quashed, and that the state magistrate judge who did so questioned whether the no contact order should have been issued in the first instance.  Nonetheless, on the particular facts before the Court here, Oak's allegations and the evidence (or lack thereof) that he purports to rely upon simply do not create a genuine issue of material fact as to whether there was an deprivation of Oak's property in violation of the Fourteenth Amendment.

### 3.    Malicious Prosecution and Abuse of Process Claims

Oak also raises claims of malicious prosecution and abuse of process.  Because such claims have similar elements, and rest upon similar allegations in this case, the Court will consider them in tandem here.

A malicious prosecution constitutional claim requires proof: (1) "that defendants

---

[16]  A paradigmatic example of a substantive due process violation is brutality by police or prison guards.  However, that does not exhaust the possibilities.  *See, e.g., Wood v. Ostrander*, 851 F.2d 1212 (9th Cir. 1988) (when an officer arrested the intoxicated male driver and impounded the vehicle in which a female passenger was riding, and left the passenger on the side of the road late at night in a bad neighborhood, where she was then raped, the court found a genuine factual dispute as to whether the officer deprived her of her due process right to personal security).

prosecuted [plaintiff] with malice," (2) "without probable cause," and (3) that they did so for the purpose of denying [him] equal protection or another specific constitutional right." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) (internal citation omitted).[17] Malicious prosecution actions are not limited to suits against prosecutors but may be brought . . . against other persons who have wrongfully caused the charges to be filed." *Id.*

The question of malice is focused on the intent or state of mind of the person initiating the prosecution. Probable cause, in contrast, focuses upon the information known to the same person. *Estate of Tucker v. Interscope Records*, 515 F.3d 1019, 1030-31 (9th Cir. 2008). Therefore, the "probable cause inquiry is objective, asking whether a reasonable person would have thought that the claim was legally tenable without regard to [her] mental state," while the malice inquiry focuses on the "subjective mental state of the defendant in instituting the prior action." *Id.* at 1031 (internal citations and punctuation omitted). "Probable cause exists when the facts and circumstances within the officer's knowledge are sufficient to cause a reasonably prudent person to believe that a crime has been committed." *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1054 (9th Cir. 2009). Importantly, the existence of probable cause is an absolute defense to a malicious prosecution claim. *Id.*

An abuse of process claim requires proof of two elements: (1) a willful act in the use of

---

17 Neither Oak's complaint nor his briefing make clear whether Oak is alleging a federal or state claim of malicious prosecution. The elements for a malicious prosecution claim under Idaho law are: "(1) That there was a prosecution; (2) That it terminated in favor of the plaintiff; (3) That the defendant was the prosecutor; (4) Malice; (5) Lack of probable cause; and (6) Damages sustained by the plaintiff." *Badell v. Beeks*, 765 P.2d 126, 127 (Idaho 1988). Oak would not be able to prove *at least* one of these elements – specifically, he cannot prove that the defendants were prosecutors. Accordingly, and because his Complaint could be construed to allege a malicious prosecution claim in the form of a Section 1983 claim, the Court will consider the malicious prosecution claim as one brought under 42 U.S.C. § 1983.

**MEMORANDUM DECISION AND ORDER - 18**

the local process, not proper in the regular course of the proceedings, that was (2) committed for an ulterior, improper purpose.[18] *Badell v. Beeks*, 765 P.2d 126, 129 (Idaho 1988). Idaho law provides that "[a] governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which . . . rises out of . . . abuse of process." I.C. § 6-904(e). Malice means "the intentional commission of a wrongful or unlawful act, without legal justification or excuse and with ill will, whether or not injury was intended." *Beco Constr. Co. v. City of Idaho Falls*, 865 P.2d 950, 955 (Idaho 1993). Criminal intent "is satisfied if it is shown that the defendant knowingly performed the proscribed acts." *Doe v. Durtschi*, 716 P.2d 1238, 1242 (Idaho 1986).

> **a.      There are Genuine Issues of Material Fact on the Malicious Prosecution and Abuse of Process Claims Against Lt. Kelley**

Lt. Kelley was assigned to investigate Matthews' allegations against Oak on January 28, 2010. When Lt. Kelley interviewed Matthews, she detailed the incident that occurred five months earlier, on August 25, 2009, in which Oak and Matthews had an altercation and he forcefully moved her from where she was sitting in front of the door out of their bedroom. She also informed Lt. Kelley that she was scared and frightened, that recently she had found a gun in Oak's nightstand, and that she thought he may have installed spyware on her computer and a GPS tracker on her vehicle. Matthews admitted the none of the couple's children had seen this incident. The next day, Lt. Kelley interviewed the couple's daughter, Amanda, who told Kelly that she had taken photographs of her mother's face and neck the evening of the incident but that she did *not* see or hear anything that happened between her parents, perhaps because she

---

[18] The Ninth Circuit does not recognize a § 1983 claim for abuse of process. Therefore, the Court construes this claim as a state law claim, brought pursuant to Idaho law.

**MEMORANDUM DECISION AND ORDER - 19**

had earphones in that blocked out all peripheral noise.  Amanda stated she did not know what happened that night, had never seen any physical altercations between her parents, and to her knowledge, neither had her brother or sister.  The photographs taken by Amanda were provided to Lt. Kelley by Matthews and are a part of the police report.

A citation was issued against Oak charging him with domestic battery with children present, in violation of Idaho Code § 18-918(4).[19]  A no contact order was also issued.

There is a question of material fact on the issue of whether probable cause existed for Lt. Kelley to issue this citation against Oak.  Even if there was probable cause to find that a domestic battery has been committed, the specific charge sworn out by Lt. Kelley against Oak was that of domestic battery *in the presence of a child*.  However, the information in Lt. Kelley's police report, which he incorporated into his statement of probable cause, indicated that none of the children witnessed or heard the incident in question, or ever saw any incident of physical abuse.  Matthews herself told Lt. Kelley that the children had not seen this altercation or other incidents.  While their daughter was home when this occurred, she told Lt. Kelley she did not see or hear anything.  Hence, when viewing the facts and the inferences that can be reasonably drawn therefrom most favorably to Oak, there is a question of fact as to whether probable cause existed for this charge, particularly as to the "with children present" aspect, that precludes summary judgment.  Further, while Lt. Kelley attempts to argue that it was the decision of the prosecutor to issue the citation, there are disputed facts as to this as well.  The prosecutor testified that the citation was already filled out by Lt. Kelley when he met with him the afternoon

---

[19] "In the presence of a child" means in the physical presence of a child or knowing that a child is present and may see or hear an act of domestic assault or battery.  I.C. § 18-918(4).

of January 29, 2010.  Further, it is Lt. Kelley that provided the "Officer Probable Cause" document with his police report attached.  *See* Herzog Dep., Ex. 1 (Dkt. 33-1).

Similarly, on the abuse of process claim, when the facts are construed in Oak's favor, there remains a genuine issue of material fact as to whether Lt. Kelley acted either with "malice" or "criminal intent" when pursuing the criminal charges and no contact order against Oak. Criminal intent requires that the defendant "knowingly performed the proscribed acts."  *See Durtschi*, 716 P.2d at 1242.  There are facts from the recorded interview of Matthews that were not included in the "Officer Probable Cause" document presented to Mr. Herzog and the judge which Oak could reasonably argue should have been included in order to present a more even-handed depiction of the circumstances as they then existed.  For instance, there is no mention of Matthews' concern about Oak making her look bad in the divorce proceeding and at work, that she had been unable in the civil divorce case to have him removed from the house, that she was unhappy about the fact that she was paying the bills and Oak was contributing nothing financially.[20]  There is no specific reference that although the incident occurred on August 25, 2009,  Matthews waited five months –  until after she filed for divorce – to report it.  There is no mention that Matthews asked Kelley if a no contact order could be issued against Oak, nor is there mention of the fact that Matthews had filed for a divorce.   There is no indication in the probable cause statement generally, or in the report of Kelly's interview with Matthews, that the

---

[20]  *See* Herzog Dep., pp. 24, 41-42 (Herzog testified that he was not sure if he knew about the divorce proceeding at time he sought the no contact order and that he was not aware of the audio recording between Lt. Kelley and Matthews); Kelley Dep., pp. 79-80 (Matthews requested the no contact order); NCO Hearing, p. 101 (Lt. Kelley testified that Matthews had mentioned to him that it was better for Oak to leave the home because she was paying the mortgage).  *See also* Audio recording between Matthews and Kelley at approx. 10:36, 15:05.

interview was recorded.   In the audio recording, it is Matthews who first brings up a no contact order, and she tells Lt. Kelley that a no contact order would have to be issued in conjunction with a criminal charge.  Lt. Kelley responds "we can do that and it won't be a problem."

The Defendants may be able to offer benign explanations for the absence of such information in the probable cause statement and in the report, but in this procedural setting the Court must construe such facts, and their reasonable inferences, most favorably to the non-movant Oak.  Those inferences create a genuine issue of material fact as to whether Lt. Kelley acted with malice or criminal intent and accordingly, he is not afforded the protection of I.C. § 9-904(e) at this stage.

> **b.     There are Issues of Fact on the Malicious Prosecution and Abuse of Process Claims Against Matthews**

The claim of malicious prosecution against Matthews requires a multi-layered analysis. Not only was Matthews a police officer, she was also the alleged victim of the domestic violence in question.  Even if Matthews was not acting in her "official capacity" as a police officer when she made her complaint to Lt. Kelley and other officers at the Pocatello Police Department, a private party who is "acting under color of state law" may be held liable under § 1983.  *See Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002).  A person acts under "color of state law" either when the private party "conspires with state officials to deprive others of constitutional rights" or "jointly engage[s] with state officials in the challenged action . . ."  *Pleasant v. Turner*, 2013 WL 5798994, *5 (E.D. Cal. Oct. 28, 2013) (internal citations and quotations omitted). While "merely complaining to the police does not convert a private party into a state actor," a private party acts under color of state law where she has entered into "joint action" with the state actor.  *Id*. at *6.  In this setting, the Court must draw all reasonable inferences from the record in

favor of Oak, as the non-movant, and in doing so, the Court finds that a jury could find that Matthews, even though a private individual in making her complaint to the Pocatello Police Department, conducted herself in a manner that could be understood as acting under color of state law.

Further, in considering the elements of a malicious prosecution claim, the Court finds there are genuine issues of material fact as to whether Matthews was acting with malice in making allegations of domestic battery with children present against Oak, and without probable cause. She did not raise her complaint against Oak until five months after the incident. Matthews made statements in her interview with Lt. Kelley that Oak was trying to make her "look bad" in their divorce proceedings, that she was having a difficult time getting a hearing date to have Oak removed from their home in the civil divorce case that she filed against Oak, she initiates a discussion with Lt. Kelley about the prospect of Oak being removed from the family home with a no contact order, and tells him that there would have to be a criminal charge to support such an order. Matthews asked her daughter to take photographs of her neck and face after the incident, but when interviewed, her daughter said that she did not see any violent act between her parents, that she was on a different floor of the house at the time of the alleged incident, and said that she could not have heard anything because she was listening to music on her earphones. Her daughter also said that even though she had been around her parents at times when they were arguing, she had never seen any physical violence between them. Lt. Kelley's report submitted in support of his statement of probable cause for the charge of "Domestic Battery w/children present" in violation of Idaho Code § 18-918(4) says that Matthews reported that "she and her husband's relationship had been strained over the past several months" and that

"for some reason on this date, they had not been talking." But the report does not mention the fact of the divorce proceedings, and does not mention Matthews statements from which it could be inferred that Matthews was looking for some way to force Oak out of the family home. The Court finds that these facts could support an inference that Matthews acted with malice in causing the charges against Oak to be filed.

Similarly, the Court finds that there is a genuine issue of material fact on the abuse of process claim. The facts described above are part of the basis for the Court's assessment of the record in that regard. But there are also inferences that can be drawn from the fact that the audio recording of the interview contains statements by Matthews that she was having a difficult time having Oak removed from her house in the divorce proceeding, that she believed he was trying to make her look bad in the divorce proceedings and "screw up her job." There is an express discussion between Matthews and Kelly about obtaining a no contact order against Oak, and Matthews says that it "has to be in conjunction with a criminal charge." Other of the particulars of the tape-recorded interview, and the inferences that Oak believes should be drawn from such details, are found in Plaintiff's Statement of Material Facts in Dispute Pursuant to Local Rule 7.1(c)(2) (Dkt. 32). Those facts, in the broader context of the particular details of the alleged battery, reasonably could be inferred to conclude that she made these allegations against him for the purpose of having him removed from the house and gain an advantage in the divorce proceeding. Further, such inferences could reasonably support a finding that Matthews was not acting in the "course and scope" of her employment when she made these allegations (if she were seeking the protection of I.C. § 6-904(3)) and therefore would not be insulated from such a claim, if she were also found to have been acting with malice or criminal intent.

**MEMORANDUM DECISION AND ORDER - 24**

### c. Oak has Adequately Pled a Constitutional Violation to Support His Section 1983 Claim for Malicious Prosecution.

The Court has treated Oak's claim for malicious prosecution as asserting a § 1983 claim, premised upon the conduct of Lt. Kelley and Matthews that Oak contends constituted malicious prosecution. *See supra*, pp. 17-18. Defendants contend that Oak's claim in that regard must fail, for the reasons discussed at further length above, and primarily in regard to Defendants' argument that there was probable cause for the issuance of the no contact order, and therefore Oak cannot prove each of the elements of a malicious prosecution claim.

As previously described, the Court finds that there are genuine issues of material fact that preclude a grant of summary judgment based upon an argument that there is no probable cause or malice in the actions of Lt. Kelley or Matthews. However, Oak must also sufficiently allege the nature and source of the constitutional right which he claims was violated, in order to move forward with a § 1983 claim for malicious prosecution. The burden placed on Oak in that regard is more than would be required of him if he were seeking to prove a state, common law, claim for malicious prosecution. In the realm of a § 1983 claim based upon that conduct, he must also "prove that the defendants acted for the purpose of depriving him of a 'specific constitutional right,'" because "no substantive due process right exists under the Fourteenth Amendment to be free from prosecution without probable cause." *Awabdy*, 368 F.3d at 1069. Oak's Complaint draws no such precise connections, other than the fact that it contains reference to a claim for malicious prosecution, and to "taking of Plaintiff's property without due process" and "taking of Plaintiff's interests in the visitation, care, and association with his minor children" both as secured by the Fourteenth Amendment, in a loosely tied connection to the general factual allegations of his Complaint. *See* Compl. ¶ ¶ 37-39.

Oak's burden is to "prove that the defendants acted for the purpose of depriving him of a "specific constitutional right." *Awabdy*, 368 F.3d at 1069.   He describes the particulars of such a claim a bit more in his briefing, and alluded to the same in the oral argument of his counsel, but frankly, the argument made in the product of all of that is still a thinly drawn and difficult to follow theme.  It is, however, sufficient to support the remaining leg of his claim of a violation of his constitutional rights based upon an alleged malicious prosecution, at least against a summary judgment challenge.

### d.  There is No Qualified Immunity for Lt. Kelley and Matthews

In § 1983 actions, the doctrine of qualified immunity protects state officials from personal liability for on-the-job conduct so long as the conduct is objectively reasonable and does not violate clearly established rights.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted).  The threshold question in considering application of the qualified immunity defense is whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [defendant's] conduct violated a constitutional right."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (overruled in part by *Pearson v Callahan*, 555 U.S. 223 (2009)).  If, viewing the alleged injuries in a light most favorable to the plaintiff, the Court finds a constitutional right appears to have been violated, it proceeds to the next step, which is to inquire whether the right was clearly established.  *Id*.

When determining whether there are genuine issues of material fact at the summary judgment stage, the court must take all facts in the light most favorable to the non-moving party.  In the context of qualified immunity, a trial court should not grant summary judgment when there is a genuine dispute as to "the facts and circumstances within an officer's knowledge" or

"what the officer and claimant did or failed to do."  *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993).  Because there are genuine issues of material fact regarding the facts and circumstances surrounding both Lt. Kelley and Matthews' knowledge, the Court finds qualified immunity is not applicable on the constitutional claims against them.  There is a dispute in the record regarding who made the probable cause determination to support the criminal complaint (Lt. Kelley or Mr. Herzog) in presenting the request for a no contact order before the magistrate judge, and the fact that Oak was charged with domestic battery in presence of a child despite multiple pieces of evidence indicating that the children were not in the vicinity of the incident, were unaware of what happened, and did not see or hear anything.  Such details raise an issue of fact as to the existence of probable cause as to the "while children are present" aspect of the charge against Oak.  Lt. Kelley claims he relied on the prosecutor's decision to pursue the charge and seek a criminal no contact order but that very fact is in dispute as well.  Because there are issues of fact on the probable cause aspect and the actual circumstances of the charge and no contact order, the Court finds, in viewing the facts most favorably to Oak, a constitutional right may have been violated.

The next question then is whether the constitutional right is clearly established.  As referenced *supra*, the Ninth Circuit has held in a § 1983 case brought on similar facts that "[m]alicious prosecution actions are not limited to suits against prosecutors but may be brought . . . against other persons who have wrongfully caused the charges to be filed."  *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004).  If Lt. Kelley or Matthews "improperly exerted pressure on the prosecutor, knowingly provided misinformation to him . . . or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal

proceedings," they can be said to have "initiated" the prosecution against Oak. *Id*. at 1067. And, there can be no reasonable question that a law enforcement officer knows that if he or she participates in an investigation by which a statement of probable cause is used to support the filing of a criminal charge, that the wrongful pursuit of the same to obtain the filing of a criminal charge against someone on false or incomplete information very likely will collide with constitutionally protected individual rights. Accordingly, the Court finds that summary judgment is not appropriate based upon the defense of qualified immunity for Lt. Kelley and Matthews.[21]

## FAIR CREDIT REPORTING ACT CLAIM

The Court now turns to Oak's Fair Credit Reporting Act claim against Matthews, on which both parties seek summary judgment.

### A.     Factual Background

In June 2010, prior to their divorce being finalized, Matthews obtained her husband's credit report through an online credit reporting agent, TransUnion. Matthews Aff., ¶ 5; Ex. A. In order to gain access to the information, Matthews represented that she was in the process of pre-approval for a home loan and her lender informed her that they needed her credit history, as well as her husband's. *Id*. ¶ 4. On the TransUnion website, she entered Oak's name, social security number and birth date in order to obtain his credit report. *Id*. ¶ 5. Matthews says that

---

[21]  Qualified immunity is a defense to claims brought pursuant to 42 U.S.C. § 1983. Defendants do not assert that they are entitled to qualified immunity for the state tort claim of abuse of process nor does it appear that Idaho recognizes such a defense for tort claims brought against government employees. This is in line with other jurisdictions. *See, e.g., Cousins v.Lockyer*, 568 F.3d 1063, 1072 (9th Cir. 2009) (the doctrine of qualified immunity is a federal doctrine that does not extend to California state tort claims against government employees).

she believed the information regarding Oak's debts and obligations was "community" (which the Court presumes to mean "marital community") information to which she was entitled as his spouse. *Id*. ¶ 7. Matthews says that she did not disclose the information to anyone else, nor use it for any personal reasons other than to make certain there were no community debts of which she was unaware. *Id*. ¶ 9.

**B.      Discussion**

The Fair Credit Reporting Act allows access to a consumer's credit report only for specified permissible purposes. *See* 15 U.S.C. § 1681b(a)(3)(A-F). Under the FCRA, a credit reporting agency may provide a consumer's credit report:

> To a person which it has reason to believe--
> (A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review of collection of an account of, the consumer; or...
> (F) otherwise has a legitimate business need for the information --
> > (i) in connection with a business transaction that is initiated by the consumer; or
> > (ii) to review an account to determine whether the consumer continues to meet the terms of the account.

*Id*. at § 1681b(a)(3)(A, F). A "person shall not use or obtain a consumer report for any purposes unless – (1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and (2) the purpose is certified . . . by a prospective user of the report through a general or specific certification." 15 U.S.C. § 1681b(f). Accordingly, "where a user either willfully or negligently obtains a consumer's credit report without a permissible purpose, the user is civilly liable to the consumer." *Cappetta v. GC Servs. Ltd. P'ship*, 654 F. Supp. 2d 453, 457 (E.D. Va. 2009).

To state a claim for willful or negligent misuse or acquisition of a consumer report under

the FCRA, a plaintiff must prove that: (1) there was a consumer report; (ii) the defendant used or obtained it; (3) the defendant did so without a permissible statutory purpose; and (iv) the defendant acted with a specified culpable mental state (willfulness or negligence). *See Shepherd-Salgado v. Tyndall Fed. Credit Union*, 2011 Wl 5401993, *3 (S.D. Ala. Nov. 7, 2011).

Oak contends that Matthews did not have a permissible purpose to obtain his credit report. Matthews asserts that she obtained Oak's credit report because she was applying for a home loan and wanted to make sure there were no community debts that she was unaware of. Other courts that have considered the issue have ruled that investigating the financial activities of a former or estranged spouse is not a permissible purpose for obtaining a credit report under the FCRA. In the context of divorce proceedings or when parties are formally separated, often the reasons given are not a "permissible purpose" for obtaining the credit report. One example is *Cole v. American Family Mut. Ins. Co.*, 410 F. Supp. 2d 1020 (D. Kan. 2006), in which the defendant husband twice obtained the credit report of plaintiff wife, from whom he was separated, during their divorce proceedings. The husband contended he had a permissible purpose for doing so, arguing that the divorce proceeding was a "business transaction" in which money and property issues were being sorted out. The court rejected this argument, relying in particular upon the Federal Trade Commission Comments to § 1681b(3)(E) which specifically states that "litigation is not a 'business transaction' involving the consumer." *Id*. at 1023. *See* 55 Fed. Reg. 18,816 (May 4, 1990). Similarly, obtaining an ex-spouse's credit report to compare current accounts with former joint accounts was impermissible, as was trying to ascertain if an estranged spouse was concealing assets or engaging in other financial misconduct. *See Yohay v. City of Alexandria Employees Credit Union, Inc.*, 827 F.2d 967 (4th Cir. 1987); *Thibodeaux v.*

*Rupers*, 196 F. Supp. 2d 585 (S.D. Ohio 2001)).  *See also Duncan v. Handmaker*, 149 F.3d 424, 427–28 (6th Cir. 1998) (holding that the use of a credit report in litigation outside the realm of debt collection generally will be an impermissible purpose).  Even the FCRA's own regulations recognize: "There is no permissible purpose to obtain a consumer report on a nonapplicant former spouse or on a nonapplicant spouse who has legally separated or otherwise indicated an intent to legally disassociate with the marriage."  Appendix - Commentary to the Fair Credit Reporting Act, 16 C.F.R. Pt. 600 App. § 604(3)(A)(5)(B) (2001).

However, even if Matthews obtained Oak's credit report for an impermissible purpose, she is liable for doing so only if her violation was willful or negligent.[22]  Further, under 15 U.S.C. § 1681n(a), a violation of the FCRA must be willful to result in enhanced damages, beyond actual damages.  *Zamora v. Valley Fed'l S & L, Ass'n*, 811 F.2d 1368, 1370 (10th Cir. 1987).  Willful noncompliance with the FCRA can be proved by a showing "that [the defendant] 'knowingly and intentionally committed an act in conscious disregard for the rights of others,' but need not show 'malice or evil motive.'"  *Bakker v. McKinnon*, 152 F.3d 1007, 1013 (8th Cir. 1998) (citations and additional quotation marks omitted).  If the plaintiff only can prove a negligent violation of the FCRA then he is only entitled to "actual damages," and if there are no

---

[22]  Oak brings suit under 15 U.S.C. § 1681n which allows for civil liability for willful noncompliance with the FCRA.  Specifically, the statute states:

> Any person who willfully fails to comply with any requirement imposed under this title with respect to any consumer is liable to that consumer in an amount equal to the sum of . . . actual damages sustained by the consumer as a result of the failure or $1,000, whichever is greater.

15 U.S.C. § 1681n(a)(1)(A).

**MEMORANDUM DECISION AND ORDER - 31**

actual damages, he is not entitled to recover.

On these facts, for the same reasons and inferences described *supra*, whether Matthews'
actions amount to "willful noncompliance" with the FCRA is a question that survives summary
judgment. *See Rodgers v. McCullough*, 296 F. Supp. 2d 895, 902 (W.D. Tenn. 2003).

However, in addition to arguing that she did not willfully violate the FCRA, Matthews
contends that Oak has not suffered any actual damages. Indeed, in his Complaint, Oak does not
allege any actual damages for his FCRA claim but in an attached affidavit to his motion, he
alleges that he incurred attorney's fees and that he lost the ability to obtain his one "free" credit
report a year. Oak Aff. I (Dkt. 27), ¶¶ 7-8, 19-20, 22. Oak also attests that this caused him
anxiety, loss of sleep, and a fear of police and the government. *Id*. at ¶¶ 18. Mental distress
constitutes a recoverable element of damages under the FCRA. *See Thompson v. San Antonio
Retail Merchs. Ass'n*, 682 F.2d 509, 513-14 (5th Cir. 1982). While such damages must be
supported by more than conclusory allegations, and even though the proof put forward by Oak
on this issue is very thin, the Court finds that Oak has alleged sufficient "actual damages" to
keep his claim alive at this stage of the case. But, correspondingly, neither the facts on liability
nor on actual damages for the FCRA claim are sufficient to warrant summary judgment in Oak's
favor on this claim.

## ORDER

Based on the foregoing, IT IS HEREBY ORDERED:

1.      Defendants City of Pocatello, Terry Felsman, Cliff Kelley, James "J.R." Miller,
and Kristen Matthew Oak's Motion for Summary Judgment (Dkt. 25) is GRANTED IN PART
and DENIED IN PART;

**MEMORANDUM DECISION AND ORDER - 32**

2.    Plaintiff Brian H. Oak's Motion for Partial Summary Judgment (Dkt. 26) is DENIED.

3)    Plaintiff's Claims Against the City of Pocatello, Terry Felsman, and James "J.R." Miller are all DISMISSED with prejudice.   Plaintiff's Claims of Fourteenth Amendment Violations Against Cliff Kelley and Kristen Matthews Oak are DISMISSED with prejudice. The following claims remain: malicious prosecution in violation of 42 U.S.C. § 1983 and abuse of process against Cliff Kelley and Kristen Matthews Oak and Violation of the Fair Credit Reporting Act against Kristen Matthews Oak.

DATED:  **March 31, 2014**



_____
Honorable Ronald E. Bush
U. S. Magistrate Judge